1
2
3
4
5
6
7

8                    **UNITED STATES DISTRICT COURT**

9                    **EASTERN DISTRICT OF CALIFORNIA**

10

11   ALEXANDER MAURICIO MARTINEZ          Case No. 1:25-CV-01035 JLT HBK
     HERNANDEZ,

12                                         ORDER GRANTING PRELIMINARY
                   Petitioner,             INJUNCTION[1]

13
     v.                                    (Doc. 5)
14
     TONYA ANDREWS, ET AL., et. al,
15
                   Respondents.
16

17          Alexander Mauricio Martinez Hernandez, an El Salvadoran national, is an asylum seeker

18   who claims to have fled to the United States in 2021 seeking refuge because he is gay and

19   because of threats and persecution he suffered after testifying against gang members who

20   murdered his friend. (Doc. 1, ¶¶ 1, 34.)

21          On or about April 6, 2021, Mr. Martinez Hernandez was encountered by a Border Patrol

22   Agent approximately one mile north of the U.S.-Mexico border approximately 9 miles from the

23   Tecate, California Port of Entry. (Doc. 11-1 at 13.) He admitted to being a Citizen of El Salvador

24   and to not possessing proper immigration documents allowing him to enter or remain in the

25

26   _____
     [1] Upon the agreement of the parties, the Court converts the motion for temporary restraining order into one for
     preliminary injunction. Respondents had notice, opportunity to respond and be heard. Additional briefing is not
27   required and the standard for a TRO and a preliminary injunction is the same. As such, given the nature of the relief
     granted by this order and to allow Respondents to appeal should they choose, the Court converts this to a Motion for
28   Preliminary Injunction. In addition, counsel agreed that no further briefing is required as to the merits of the petition.
     Thus, the Court takes the question of the merits of petition for habeas corpus under submission.

United States legally. (*Id.*) As a matter of routine processing, DHS entered Mr. Martinez Hernandez's biographical and biometric information into the DHS processing system, which returned information indicating he had a criminal record in El Salvador and was affiliated with the MS-13 gang. (*Id.* at 12–13.) Specifically, his record included arrests for "aggravated damage" in 2011 and aggravated murder in 2013. (*Id.* at 57.) Records submitted by Plaintiff in reply indicate that the charges remained pending at least of March 10, 2020. (Doc. 13, Exhs. 1–4.) According to Petitioner's reply brief, he has always maintained the allegations against him in El Salvador are falsified. (Doc. 12 at 8.) Petitioner's declaration supports this assertion:

> As I describe in my asylum application and declaration, I witnessed MS-13 gang members murder a friend of mine in El Salvador. I acted as a witness in the police investigation of the murder and attended lineups to identify my friend's assailants. When the MS-13 gang discovered that I was cooperating with police, they began to threaten me and my family. I abandoned the investigation out of fear, but the police forced me to rejoin them. They said they would charge me with my friend's murder and imprison me if I refused to continue working with them

(Doc. 5-5, ¶ 5.)

He was issued a "Notice and Order of Expedited Removal" (Form I-860), dated April 6, 2021, which indicated that, pursuant to 8 U.S.C. 1225(b)(1), he was determined inadmissible under 8 U.S.C. § 1182(7)(A)(i)(I). (*Id.* at 16.)

Also on April 6, 2021, Mr. Martinez Hernandez made a credible fear claim. (Doc. 11-1 at 11. (Form I-213 prepared on that date indicating disposition of: "Expedited Removal with Credible Fear."). In addition, his sworn statement was recorded on a Form I-867A(Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act). (*Id.* at 18–19.) In that statement, he admitted to having been arrested only once for disorderly conduct in El Salvador. (*Id.* at 18.) Mr. Martinez Hernandez also asserted that he left El Salvador because of fear, because he was threatened, and because he was the victim of an attempted kidnapping. (*Id.* at 19–21.)

On May 3, 2021, he was issued a Notice to Appear "[i]n removal proceedings under Section 240 of the Immigration and Nationality Act." (Doc. 11-1 at 7–8.) The Notice to Appear indicated that an asylum officer "found that the respondent has demonstrated a credible fear of

1    prosecution or torture." (*Id*. at 7.)

2        Mr. Martinez Hernandez was thereafter denied parole on May 21, 2021, July 11, 2021,

3    October 8, 2021, October 15, 2021, each time because ICE concluded Petitioner had not

4    established to ICE's satisfaction that he was not a flight risk, security risk, or danger to the

5    community, and failed to make any alternative showing that would justify release, including

6    having a serious medical condition or that his release would otherwise be in "the public interest."

7    (Doc. 11-1 at 23–33.)

8        He was initially detained at Adams County Detention Center, (Doc. 11-1 at 7), but was

9    later transferred to Winn Correctional Center in Louisiana. (*Id*. at 3, ¶ 11.) On August 16, 2021,

10   while he was still in detention, he applied for asylum, (Doc. 1, ¶ 1), within the one-year post

11   entry timeframe. *See* 8 U.S.C. § 1158(a)(2)(B).

12       On December 2, 2021, DHS released Mr. Hernandez on his own recognizance, pursuant to

13   INA § 236, 8 U.S.C. § 1226, contingent on his participation in the Alternatives to Detention

14   (ATD) program and on his compliance with certain conditions of release. (Doc. 1, ¶ 1; Doc. 11-1

15   at 38–40.) In doing so, immigration officials necessarily determined that Petitioner did not

16   present a risk of flight or danger to the community. *See* 8 C.F.R. § 1236.1(c)(8) ("Any officer

17   authorized to issue a warrant of arrest may, in the officer's discretion, release an alien not

18   described in section 236(c)(1) of the Act, under the conditions at section 236(a)(2) and (3) of the

19   Act; provided that the alien must demonstrate to the satisfaction of the officer that such release

20   would not pose a danger to property or persons, and that the alien is likely to appear for any

21   future proceeding."). This determination was made notwithstanding the fact that DHS was aware

22   of the criminal charges pending against him in El Salvador.[2]

23       After leaving detention, Petitioner moved to San Jose, California. He filed a Form E-33,

24   Change of Address, with the Immigration Court. (Doc. 1, ¶ 36.) The Department's original Order

25   of Release on Recognizance required that Petitioner call ICE in San Francisco, his intended

26   destination, upon his release. (*Id*.) Later, his ISAP supervision was moved to San Jose, at which

27

28   [2] Mr. Martinez Hernandez submitted evidence in his immigration court in October and November 2021 to show that he had no criminal history in El Salvador, including the investigative report regarding the criminal charges against him. (*See* Doc. 13 ¶ 7 & Ex. 4.)

1   point he was assigned monthly check-ins over the SmartLink phone application. (*Id.*)

2          On July 13, 2023, Mr. Martinez Hernandez was arrested on charges of robbery (Cal. Pen.

3   Code § 211), preventing/dissuading a victim/witness (§ 136.1(a)(1)), assault with a deadly

4   weapon (not a firearm) (§ 245(A)(1)), and battery (§ 242). (Doc. 11-1 at 47.) Those charges were

5   dropped the next day for lack of evidence. (*Id.*) He has no other criminal history in the United

6   States. (Doc. 1, ¶ 37.)

7          On September 6, 2023, United States Citizenship and Immigration Services issued him an

8   employment authorization document. (*Id.*) He obtained work at a furniture company in quality

9   control, then as a driver delivering furniture. (Declaration of Petitioner, Doc. 5-5, ¶ 11.) He also

10  worked at a beverage distribution company as a merchandiser. (*Id.*)

11         Petitioner claims that he diligently complied with the terms of the ATD program by

12  attending monthly phone appointments with the Intensive Supervision Appearance Program

13  (ISAP) while he awaited a hearing on the merits of his asylum claim at the San Francisco

14  Immigration Court. (Doc. 1, ¶ 2.) He explains his interactions with ISAP as follows:

15         12) I wore an ankle monitor and complied with DHS's reporting
16         requirements for almost four years after my release from
           immigration detention, until I was detained again.

17         13) At first, I did not have regular check-ins with ISAP. I only had
18         to go to the ISAP offices in San Francisco when I had technical
           problems with the bracelet. I traveled to San Francisco ISAP for
19         this reason around seven times.

20         14) Later, ISAP opened an office in San Jose, and my case was
           transferred there. Officers at ISAP in San Jose had me install an
21         application on my phone called SmartLink so they could
           communicate with me and update me on my appointments. I also
22         attended about two in-person check-ins in San Jose. Then, they
           assigned me virtual check-ins, which I attended via SmartLink.
23         There were two types of meetings: at-home check-ins, which
           required that I be at home, and office check-ins, when my location
24         did not matter. I always attended these appointments.

25         15) My job required me to make deliveries sometimes several hours
           from San Jose. ISAP knew about these trips because of my GPS
26         monitor. The first time I traveled outside of the Bay Area, in late
           2023, I received a phone call from my ISAP officer, Chris, who
27         informed me that I was supposed to stay within a certain geographic
           area. I told him that I was traveling for work. He asked me if I was
28         going to stay for more than one day, and I said no. He told me that
           traveling outside of the geographic area was okay as long as I did

1    not stay more than a day without informing him. I agreed to do so, and always complied with this restriction.

2

3    16) Two or three times, I had to travel to Bakersfield for my work and the company put us in a hotel overnight. Each time, I told Chris that I would be traveling for more than a day and he said it was fine.

4

5    17) I was never told by an ISAP officer that I had violated any terms of my release. I was always in communication with Chris, and he never mentioned anything about any violations.

6

7    (Doc. 5-5 at 3–4.)

8        On May 29, 2024, the Department of Justice issued Mr. Martinez Hernandez a notice

9    indicating that his June 18, 2025 hearing date had been reset for November 16, 2026. (Doc. 5-3

10   at 13.) On August 5, 2024, Mr. Martinez Hernandez received notification on his SmartLink

11   application that he was required to attend an in-person meeting with them the next day at the

12   ISAP offices in San Jose. (Doc. 5-5. ¶ 18.) When he arrived, he was called into an office where

13   five officers were waiting for him. (*Id*.) He stopped in the door and one of the officers who had

14   walked behind him pushed him into the room and pulled his arms against his back. (*Id*.) When

15   Mr. Martinez Hernandez asked why he was being arrested, he was informed that he had "many

16   violations" but was not given any further explanation. (*Id*.) Respondent produced a copy of a

17   Warrant for Arrest of Alien (I-200), dated July 26, 2025, authorizing Petitioner's arrest based on

18   "the pendency of ongoing removal proceedings" against Petitioner; and that records, statements

19   or reliable evidence indicate either that Petitioner lacks immigration status or is otherwise

20   removable.[3] (Doc. 11-1 at 121.)

21       A DHS report authored shortly after Mr. Martinez Hernandez's re-detention on August 8,

22   2025 states that Petitioner reported to his in-person meeting "due to multiple ATD violations,"

23   listing several missed/failed virtual and/or home visits; "master zone leave alerts" and missed

24   callbacks related to his tracking device, and referencing others listed in Petitioner's A-File. (Doc.

25   11-1 at 124; *see also id*. at 112–119 (spreadsheet listing violations).) The most recent violation

26   was on July 24, 2025, when he failed a home visit. (*Id*. at 126.) The report concludes with the

27

28   [3] At the hearing, the government took the position that the petition was detained un § 236(a) and that he is entitled to a bond determination if he asks for one.

5

following recommendation: "No Bond/Flight Risk/Criminal History." (*Id.*)

During the arrest, Mr. Martinez Hernandez hit his head against a table.[4] (Doc. 5-5, at ¶ 18.) He lost consciousness. (*Id.*) When he retained consciousness, two ICE officers were walking him to a van. (*Id.*, ¶ 19.) Mr. Martinez Hernandez told the officers that he was experiencing head pain and nausea and requested to go to a hospital. (*Id.*) He was taken to Saint Louise Hospital in Gilroy, California, where he was examined and discharged the same day. (*Id.*) He was then transferred to Golden State Annex in McFarland, California, where he remains. (Doc. 11-1 at 4, ¶ 20; 128.) As of the date of his sworn declaration, August 22, 2025, Mr. Martinez Hernandez claims to still have headaches, head and neck pain, and nausea from his injury. (Doc. 5-5, ¶ 22.) He saw medical staff at Golden State on one occasion and was given an X-Ray but was not provided with any results. (*Id.*)

Prior to his detention, Mr. Martinez Hernandez and a friend lived together in an apartment in San Jose, California. (*Id.*, ¶ 21.) Because he has not been able to contribute to the rent since his detention, she had to give up the apartment because she cannot afford to live there on her own. (*Id.*)

On August 15, 2025, Mr. Martinez Hernandez filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241, alleging that his detention constitutes a violation of the Fifth Amendment's right to substantive and procedural due process. (Doc. 1, ¶¶ 50–59.) He seeks immediate release from custody; a declaration of the violation of his rights under the Fifth Amendment[5]; an injunction prohibiting his transfer away from this District or deportation pending the conclusion of these proceedings; an injunction preventing his re-detention without a pre-deprivation custody hearing "before a neutral arbiter in which the government bears the burden of proof, by clear and convincing evidence, that Petitioner is a flight risk or danger to the community"; and for costs and attorney's fees. (*Id.* at 16–17.)

---

[4] Mr. Martinez Hernandez does not indicate that the arresting officers were responsible for him hitting his head, so the Court finds it unnecessary to address Respondent's response to any such suggestion. (*See* Doc. 11 at 3 n.2.)

[5] The jurisdictional allegations (Doc. 1, ¶ 10) also mention the Fourth Amendment and the Administrative Procedure Act, but there is no Fourth Amendment or APA claim alleged.

On August 22, 2025,[6] he also filed an ex parte motion for a temporary restraining order. (Doc. 5.) In that motion, he seeks immediate release without requiring bond or electronic monitoring[7] and a prohibition against re-detention without a pre-deprivation hearing. (*Id*. at 18; Doc. 2-5 at 32.)

The government opposes the issuance of preliminary injunctive relief and argues, among other things, that: (1) the injunctive relief request is improper because it seeks the same relief as the habeas petition; and (2) Petitioner is unlikely to succeed on the merits because, given the above-described release violations, DHS "lawfully made a custody redetermination and detained petitioner for flight risk and danger." (Doc. 11.) Petitioner filed a reply on July 27, 2025. (Doc. 12.) For the reasons set forth below, the Court converts the request for a temporary restraining order into a request for a preliminary injunction and **GRANTS** the motion.

## II.    LEGAL BACKGROUND

### A.    Section 240 v. Expedited Removal Proceedings

Immigration law provides two main processes for removing noncitizens deemed ineligible to enter or remain in the United States. The first, commonly referred to as "Section 240" or "Section 1229a" proceedings, is the standard mechanism for removing inadmissible noncitizens. *See generally* 8 U.S.C. § 1299a. "Section 240 removal proceedings take place before an [Immigration Judge (IJ)], an employee of the Department of Justice (DOJ) who must be a licensed attorney and has a duty to develop the record in cases before them." *Coalition For Humane Immigrant Rights, v. Noem*, No. 25-CV-872 (JMC), 2025 WL 2192986, at *3 (D.D.C. Aug. 1, 2025)[8] (citing 8 U.S.C. § 1229a(a)(1), (b)(1) ("The immigration judge shall administer oaths, receive evidence, and interrogate, examine, and cross-examine the alien and any witnesses.").)

---

[6] Petitioner does not explain why he waited five additional days to file his request for a TRO.

[7] Petitioner seeks, as an alternative, his immediate release and the setting of a pre-deprivation bond hearing before the San Francisco Immigration Court within 14 days and/or a prohibition against re-detention without "further order of this Court." (Doc. 5-6 at 2.) The Court declines to consider these alternative forms of relief.

[8] This ruling has been appealed to the D.C. Circuit, *Coalition for Humane Immigrant Rights, et al v. Kristi Noem*, et al, 25-5289 (D.C. Cir.), though the stay ordered by *Coalition* remains in place as of the signing of this order.

> [Section 240 proceedings] are adversarial proceedings in which the noncitizen has the right to hire counsel, examine and present evidence, and cross-examine witnesses. 8 U.S.C. § 1229a(b)(4). The hearings are recorded, and a transcript is made available if a party appeals the decision. *Id*. § 1229a(b)(4)(C). A section 240 proceeding typically takes place over the course of multiple hearings due to the built-in procedures. This allows time for noncitizens to both gather evidence in support of petitions for relief available in immigration court (like asylum and certain adjustments of status) and seek collateral relief from other components of DHS (like adjustment of status on the basis of marriage or family). Upon a decision by the IJ, either party may appeal to the Board of Immigration Appeals (BIA). 8 C.F.R. §§ 1240.15, 1003.1. If the BIA upholds a removal order, the noncitizen may then appeal that decision to a U.S. court of appeals. 8 U.S.C. § 1252.

*Coalition*, 2025 WL 2192986, at *3 (internal record citations omitted).

Alternatively, an immigrant may be placed in "expedited removal" status for various reasons, including that the person entered the United States without a valid visa or other valid entry documents. *See generally* 8 U.S.C. § 1225. In expedited removal, the process is overseen by an immigration officer, rather than an IJ. 8 C.F.R. § 235.3(b)(2)(i). The officer asks the immigrant questions about their "identity, alienage, and inadmissibility," and whether they intend to apply for asylum, fear persecution or torture, or fear returning to their country of origin. § 235.3(b)(2)(i), (b)(4). Noncitizens are not entitled to counsel during this questioning, and no recording or transcript is made. 8 C.F.R. § 235.3(b)(2)(i).

Under the expedited removal process, if the immigrant claims asylum, fear of persecution or torture, or a fear of returning to his or her country, "the inspecting officer shall not proceed further with removal of the alien until the alien has been referred for an interview by an asylum officer in accordance with 8 CFR 208.30." § 253.3(b)(4). Once the referral happens, the referring officer must provide the immigrant with a written disclosure (Form M-444), which describes the credible fear interview, including,

> (A) The purpose of the referral and description of the credible fear interview process;
> (B) The right to consult with other persons prior to the interview and any review thereof at no expense to the United States Government;
> (C) The right to request a review by an immigration judge of the asylum officer'' credible fear determination; and
> (D) The consequences of failure to establish a credible fear of persecution or torture.

§ 253.3(b)(4)(i). The asylum officer then must interview the immigrant and determine if the immigrant expressed a credible fear of persecution or torture. Whatever the officer's determination, it must be reviewed by the supervisory asylum officer before it becomes effective. 8 C.F.R. § 208.30(3)(8). If there is a finding of credible fear, the case is converted to a § 240 proceeding[9] and set before an IJ. If the asylum officer and the supervisor determine that the immigrant has not demonstrated a credible fear of persecution or torture, the immigrant may request review by an IJ. § 208.30(g). Essentially, the IJ's determination is final. *Id*. Likewise, habeas corpus review of the determinations made related to the expedited removal is limited. 8 U.S.C. § 1252(e)(2).

### B.    Parole

ICE may choose to release a person on parole. The decision is discretionary and is made on a case-by-case basis. An immigrant who has been detained at the border, may be paroled for humanitarian reasons or due to it providing a significant public benefit (8 U.S.C. § 1182(d)(5)(A)) or she may be conditionally released (8 U.S.C. § 1226(a)). These are distinct procedures. A person on conditional parole is usually released on their own recognizance subject to certain conditions such as reporting requirements.[10] To be released on conditional parole, there must be a finding that the immigrant does not pose a risk of flight or danger to the community. *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1115 (9th Cir. 2007).

Of relevance in this case is DHS's "Alternatives to Detention" (ATD) program, designed "to provide supervised release and enhanced monitoring for a subset of foreign nationals subject to removal whom ICE has released into the United States." *Audrey Singer*, Cong. Research Serv., R45804, Immigration: Alternatives to Detention (ATD) Programs 14 (July 8, 2019), https://sgp.fas.org/crs/homesec/R45804.pdf ). "These aliens are not statutorily mandated to be in DHS custody, are not considered threats to public safety or national security, and have been

---

[9] Alternatively, the case may be moved into administrative asylum proceedings under § 208.30(f).

[10] An immigrant cannot be released on conditional parole if they are subject to mandatory detention under § 1226(c). There is no suggestion that § 1226(c) applies in this case.

1  released either on bond, their own recognizance, or parole pending a decision on whether they

2  should be removed from the United States." (*Id.*)

3      **C.**    **Parole Revocation**

4      In *Y-Z-H-L v Bostock*, 2025 WL 1898025, at *10–12 (D. Or. July 9, 2025)—issued

5  several weeks before Mr. Martinez Hernandez's arrest on August 6, 2025—the court explained

6  the parole process in immigration cases and noted that before parole may be revoked, the parolee

7  must be given written notice of the impending revocation, which must include a cogent

8  description of the reasons supporting the revocation decision. The court held:

9          Section 1182 . . . has a subsection titled "Temporary admission of

10          nonimmigrants," which allows noncitizens, even those in required
        detention, to be "paroled" into the United States. This provision, at

11          issue in this case, states:

12              The Secretary of Homeland Security may, except as
            provided in subparagraph (B) or in section 1184(f) of

13              this title, in his discretion parole into the United States
            temporarily under such conditions as he may prescribe

14              only on a case-by-case basis for urgent humanitarian
            reasons or significant public benefit any alien applying

15              for admission to the United States, but such parole of
            such alien shall not be regarded as an admission of the

16              alien and **when the purposes of such parole shall, in
            the opinion of the Secretary of Homeland Security,**

17              **have been served the alien shall forthwith return or
            be returned to the custody from which he was**

18              **paroled and thereafter his case shall continue to be
            dealt with in the same manner as that of any other**

19              **applicant for admission to the United States.**

        8 U.S.C. § 1182(d)(5)(A).

20

21  *Y-Z-H-L v Bostock*, 2025 WL 1898025, at *3 (emphasis added). *Y-Z-H-L* determined that under

22  the Administrative Procedure Act, immigration parolees are entitled to determinations related to

23  their parole revocations that are not arbitrary, capricious or an abuse of discretion. *Id*. at *10. An

24  agency acts arbitrarily and capriciously by failing to make a reasoned determination or where the

25  agency fails to "articulate[] a satisfactory explanation for its action including a rational

26  connection between the facts found and the choice made." *Id*. Parole revocations in the context of

27  the INA must occur on a case-by-case basis and may occur "when the purposes of such parole

28  shall, in the opinion of the Secretary of Homeland Security, have been served the alien shall

forthwith return or be returned to the custody from which he was paroled." *Id*. at *12 (quoting § 212.5(e)). Section 212.5(e) requires written notice of the termination of parole except where the immigrant has departed or when the specified period of parole has expired.

In considering *Y-Z-H-L* and § 212.5(e), other courts have found that the statute requires a case-by-case analysis as to the decision to revoke parole. In *Mata Velasquez v. Kurzdorfer*, No. 25-CV-493-LJV, 2025 WL 1953796, at *11 (W.D.N.Y. July 16, 2025), the Court held similarly, though in the context of humanitarian parole:

> This Court agrees that both common sense and the words of the statute require parole revocation to be analyzed on a case-by-case basis and that a decision to revoke parole "must attend to the reasons an individual [noncitizen] received parole." *See id*. There is no indication in the record that the government conducted any such analysis here. On the contrary, the letter Mata Velasquez received merely stated summarily that DHS had "revoked [his] parole." Docket Item 62-1 at 5. Thus, there is no indication that—as required by the statute and regulations—an official with authority made a determination specific to Mata Velasquez that either "the purpose for which [his] parole was authorized" has been "accomplish[ed]" or that "neither humanitarian reasons nor public benefit warrants [his] continued presence...in the United States." *See* 8 C.F.R. § 212.5(e)(2)(i). As a result, DHS's revocation of Mata Velasquez's parole violated his rights under the statute and regulations. *See Y-Z-L-H*, 2025 WL 1898025, at *13.

In *Pinchi v. Noem*, No. 5:25-CV-05632-PCP, ___ F. Supp. 3d ___, 2025 WL 2084921, at *3 (N.D. Cal. July 24, 2025), the Court reached a similar conclusion relying on the Due Process Clause. In *Pinchi,* the court held,

> . . . **even when ICE has the initial discretion to detain or release a noncitizen pending removal proceedings, after that individual is released from custody she has a protected liberty interest in remaining out of custody**. *See Romero v. Kaiser*, No. 22-cv-02508, 2022 WL 1443250, at *2 (N.D. Cal. May 6, 2022) ("[T]his Court joins other courts of this district facing facts similar to the present case and finds Petitioner raised serious questions going to the merits of his claim that due process requires a hearing before an IJ prior to re-detention."); *Jorge M. F. v. Wilkinson*, No. 21-cv-01434, 2021 WL 783561, at *2 (N.D. Cal. Mar. 1, 2021); *Ortiz Vargas v. Jennings*, No. 20-cv-5785, 2020 WL 5074312, at *3 (N.D. Cal. Aug. 23, 2020); *Ortega*, 415 F. Supp. 3d at 969 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond.").

11

1   *Id.* (emphasis added). Other courts, including this Court, have held similarly. *Doe v. Becerra*, No.

2   2:25-CV-00647-DJC-DMC, 2025 WL 691664, at *4 (E.D. Cal. Mar. 3, 2025); *see also Padilla v.*

3   *U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1172 (W.D. Wash. 2023) ("The Supreme

4   Court has consistently held that non-punitive detention violates the Constitution unless it is

5   strictly limited, and, typically, accompanied by a prompt individualized hearing before a neutral

6   decisionmaker to ensure that the imprisonment serves the government's legitimate goals.").

7   **II.    ANALYSIS**

8       **A.    Jurisdiction**

9           **1.    Habeas Corpus**

10          Under 28 U.S.C. § 2241, the Court has the authority to determine a petition for writ of

11  habeas corpus in which the petitioner asserts they are being held in custody "in violation of the

12  Constitution or laws or treaties of the United States." "The essence of habeas corpus is an attack

13  by a person in custody upon the legality of that custody, and that the traditional function of the

14  writ is to secure release from illegal custody." *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973).

15          Mr. Martinez Hernandez seeks immediate release from custody, which, he contends,

16  violates the Constitution of the United States. Thus, he properly invokes the Court's habeas

17  jurisdiction.

18          **2.    Judicial Review under the INA**

19          The INA limits judicial review in many instances. Though 8 U.S.C § 1252(g), precludes

20  this Court from exercising jurisdiction over the executive's decision to "commence proceedings,

21  adjudicate cases, or execute removal orders against any alien," there is no removal order at issue

22  here. Thus, Court has the authority to review the termination of Mr. Martinez Hernandez's parole.

23  *See Jennings v. Rodriguez*, 583 U.S. 281, 294 (2018) (holding that § 1252(g) precludes judicial

24  review only as to the three areas specifically outlined in the subsection); *see also Reno v.*

25  *American–Arab Anti–Discrimination Committee*, 525 U.S. 471, 482 (1999).

26      **B.    Preliminary Injunction**

27          The standard for issuing a TRO is the same as the standard for issuing a preliminary

28  injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir.

1    2001) (explaining that the analysis for temporary restraining orders and preliminary injunctions is

2    "substantially identical"). When seeking a TRO or PI, plaintiffs must establish: (1) they are

3    "likely to succeed on the merits" of their claims, (2) they are "likely to suffer irreparable harm in

4    the absence of a preliminary injunction," (3) "the balance of equities tips in [their] favor" and (4)

5    "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20

6    (2008). The moving party has the burden to "make a showing on all four prongs" of the *Winter*

7    test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

8    1135 (9th Cir. 2011). Thus, the moving party has "the burden of persuasion." *Mazurek v.*

9    *Armstrong*, 520 U.S. 968, 972 (1997); *Hecox v. Little*, 104 F.4th 1061, 1073 (9th Cir. 2023). The

10   Court may weigh the request for a preliminary injunction with a sliding-scale approach. *Alliance*,

11   at 1135 (9th Cir. 2011). Accordingly, a stronger showing on the balance of hardships may support

12   the issuance of a preliminary injunction where there are "serious questions on the merits . . . so

13   long as the plaintiff also shows that there is a likelihood of irreparable injury and that the

14   injunction is in the public interest." *Id*. "A preliminary injunction is an extraordinary remedy

15   never awarded as of right." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 24 (2008).

16   Preliminary injunctions are intended to "merely to preserve the relative positions of the parties

17   until a trial on the merits can be held, and to balance the equities at the litigation moves forward."

18   *Lackey v. Stinnie*, 604 U.S. ___, 145 S. Ct. 659, 667 (2025) (citations omitted).

19        The status quo refers to "the last uncontested status which preceded the pending

20   controversy." *Tanner Motor Livery, Ltd. v. Avis, Inc*., 316 F.2d 804, 809 (9th Cir. 1963) (quoting

21   *Westinghouse Elec. Corp. v. Free Sewing Mach. Co*., 256 F.2d 806, 808 (7th Cir. 1958)). In the

22   Court's view, that is the status before Mr. Martinez Hernandez was arrested and was still on

23   parole. *See Kuzmenko v. Phillips*, No. 25-CV-00663, 2025 WL 779743, at *3 (E.D. Cal. Mar. 10,

24   2025) (granting a temporary restraining order requiring immediate release of the petitioner back

25   to home confinement from custody, as a restoration of the status quo). However, there is a dispute

26   of fact as to whether there has been a change of circumstance such that his arrest and his

27   detention pending a bond hearing, was/is justified.

28   ///

Even if the Court's action here constitutes a mandatory injunction,[11] the evidence supports that action. Mr. Martinez Hernandez alleges he has suffered and is suffering violations of his substantive and procedural due process rights and that his continued unlawful detention will impose on him serious injury if the injunction does not issue. The injunction issued here is on firm legal footing; due process clearly requires that Petitioner be given a prompt opportunity to be heard regarding the revocation of his parole. These injuries are not capable of redress through monetary compensation. Accordingly, injunctive relief is appropriate even under the higher standard for mandatory injunctions.[12]

### 1. Likelihood of Success on the Merits

This first factor "is the most important" under *Winter*, and "is especially important when a plaintiff alleges a constitutional violation and injury." *Baird v. Bonta*, 81 F.4th 1036, 1041 (9th Cir. 2023). When an immigrant is placed into parole status after having been detained, a protected

---

[11] "A prohibitory injunction prohibits a party from taking action and preserves the status quo pending a determination of the action on the merits." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (internal citations omitted). In other words, a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits." *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983). A mandatory injunction, on the other hand, "orders a responsible party to 'take action.'" *Marlyn Nutraceuticals*, 571 F.3d at 879 (quoting *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996)). Although subject to a higher standard, a mandatory injunction is permissible when "extreme or very serious damage will result" that is "not capable of compensation in damages," and the merits of the case are not "doubtful." *Id.* (internal citations and quotation marks omitted).

[12] The government questions whether the Court can order preliminary relief of the nature requested here because the relief sought is akin to the relief requested in the underlying § 2241 petition. (Doc. 11 at 5.) The government cites *Senate of Cal. v. Mosbacher*, 968 F.2d 974, 978 (9th Cir. 1992), which indeed held that entering "judgment on the merits in the guise of preliminary relief is a highly inappropriate result." But the circumstances of that case were quite different. In *Mosbacher*, the trial court ordered as preliminary relief the release of data that the defendant sought to keep private and thus, had the Ninth Circuit not reversed, the defendant would "have lost the whole case for all practical purposes." *Id.* Some district courts have relied on this line of cases to deny immigration detainee's requests for release at the TRO stage. *See, e.g., Mendez v. U.S. Immigr. & Customs Enf't*, No. 23-CV-00829-TLT, 2023 WL 2604585, at *3 (N.D. Cal. Mar. 15, 2023) (citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *Keo v. Warden of Mesa Verde Ice Processing Center*, No. 1:24-cv-00919-HBK, 2024 WL 3970514 (E.D. Cal. Aug. 28, 2024) (citing *Mendez*, *Mosbacher*, and *Comenisch*). But a closer look at *Camenisch* reveals that the Supreme Court did not intend to bar TROs of the kind requested here. Rather, *Camenisch* stands for the proposition that "findings of fact and conclusions of law made by a court in a preliminary injunction or TRO posture are preliminary and do not bind the court at the trial on the merits. Thus, it is not appropriate to enter a final judgment at a TRO stage." *Doe v. Noem*, 778 F. Supp. 3d 1151, 1167 (W.D. Wash. 2025) (evaluating government argument based on *Comenisch*). *Doe v. Bostock*, No. C24-0326JLR-SKV, 2024 WL 2861675 (W.D. Wash. June 6, 2024), cited by the government (Doc. 11 at 5), is not persuasive. There, the petitioner was released from a federal correctional facility after serving a criminal sentence directly into ICE custody and then challenged her <u>continued</u> detention. *Doe v. Bostock*, No. C24-0326-JLR-SKV, 2024 WL 3291033, at *2 (W.D. Wash. Mar. 29, 2024) (report and recommendation). Under those circumstances, the status quo was <u>detention</u>, not release, so the requested form of preliminary relief –immediate release—was inappropriate for that reason.

1   liberty interest may arise. *Young v. Harper*, 520 U.S. 143, 147-149 (1997)[13]. The Due Process

2   Clause may protect this liberty interest even where a statute allows the immigrant's arrest and

3   detention and does not provide for procedural protections. *Id.* (Due Process requires pre-

4   deprivation hearing before revocation of preparole); *Morrissey v. Brewer*, 408 U.S. 471, 482

5   (1972).

6       *Morrissey* observed that parole allows the parolee to enjoy the same activities as those

7   who have not been arrested and held in custody including, living at home, having a job, and

8   "be[ing] with family and friends and to form the other enduring attachments of normal life."

9   *Morrissey*, 408 U.S. at 482. "Though the [government] properly subjects [the parolee] to many

10  restrictions not applicable to other citizens," such as monitoring and seeking authorization to

11  work and travel, "his condition is very different from that of confinement in a prison." *Id.* "The

12  parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live

13  up to the parole conditions." *Id.* The revocation of parole undoubtedly "inflicts a grievous loss on

14  the parolee." *Id.* (quotations omitted). Therefore, a parolee possesses a protected liberty interest in

15  his or her "continued liberty." *Id.* at 481–84. As noted above, *Pinchi,* 2025 WL 2084921, at *3,

16  agreed. There is no Dispute that Mr. Martinez Hernandez was placed in Section 240 proceedings,

17  (*see* Doc. 11-1 at 7), which <u>are ongoing</u>, and conditionally paroled for more than three and a half

18  years. The Court acknowledges that the statute indicates that, "The Attorney General at any time

19  may revoke a bond or parole authorized under subsection (a), rearrest the alien under the original

20  warrant, and detain the alien." 8 U.S.C. § 1226(b). As noted above, this does not mean that DHS

21  may exercise its discretion in a manner that is inconsistent with constitutional requirements.

22      Thus, the Court must evaluate the three-part test set forth in *Mathews v. Eldridge,* 424

23  U.S. 319, 334–35 (1976), to determine whether the procedures (or lack thereof) that have been

24  applied to Mr. Martinez Hernandez are sufficient to protect the liberty interest at issue. *Pinchi*,

25  2025 WL 2084921at *3. In *Mathews*, the Court determined,

26  ///

27

28  [13] In *J.G.G.*, the Supreme Court re-affirmed that aliens are entitled to due process of law in deportation proceedings and must be given notice and an opportunity to be heard commensurate with the nature of the case. *Trump v. J. G. G.*, 604 U.S. ___, 145 S. Ct. 1003, 1006 (2025).

1

2

3

4

5

> [O]ur prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

6    424 U.S. at 334–35.

7        As to private interest, during his more than three and a half years on parole, Mr. Martinez

8    Hernandez obtained permission to work, pursued gainful employment, and did so while sharing

9    an apartment with a friend in San Jose. Thus, parole allowed him to build a life outside detention,

10   albeit under the terms of that parole. Mr. Martinez Hernandez has a substantial private interest in

11   being out of custody and his detention denies him that liberty interest. *Zadvydas v. Davis*, 533

12   U.S. 678, 690 (2001) ("Freedom from imprisonment—from government custody, detention, or

13   other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause

14   protects.").

15       The Court also finds that there is a significant risk of erroneous deprivation under the

16   present circumstances. This record suggests several reasons why petitioner's detention may not be

17   justified. First, in 2021, in releasing him on parole, an immigration judge concluded that

18   Petitioner was not a flight risk or danger to the community. This determination was made

19   notwithstanding the charges against Petitioner in El Salvador. Second, though Petitioner incurred

20   an arrest in California in 2023, the charges were dropped, the record does not reveal any details

21   about those circumstances that suggest—and the government does not argue—this arrest

22   contributes to a finding that Petitioner's circumstances have materially changed. (*See* Doc. 12 at 9

23   n.5); *see also Duncan v. California*, No. S-04-523 LKK/PAN, 2006 WL 1883385, at *2 (E.D.

24   Cal. July 7, 2006) ("[T]he mere fact that plaintiff was arrested, without more, does not establish

25   that plaintiff was engaged in criminal activity."); *Kelly v. Almodovar*, No. 25 CIV. 6448 (AT),

26   2025 WL 2381591, at *3 (S.D.N.Y. Aug. 15, 2025) (reviewing a RAP sheet, without more, is

27   "not tantamount to an individualized assessment of a suspect's flight risk or dangerousness").

28

1    The change in circumstance may be Mr. Martinez Hernandez's asserted ATD infractions.

2    As Petitioner points out, he wore an ankle monitor every single day for more than three and a half

3    years yet, he says that he was never informed of any violations. (*See* Doc. 12 at 9; Doc. 5-5, ¶ 17.)

4    Several of the violations may reflect technical problems, such as "tracker low battery" or "no

5    location received." (Doc. 11-1 at 112–19.) There were also eight "master zone leave alerts" from

6    June 2024 to July 2025, (*id.*), which may correspond to Petitioner's explanations that he was

7    given permission by his ISAP officer to travel for work for short periods of time. As Petitioner

8    points out, it is unclear whether anyone consulted with Mr. Martinez Hernandez's ISAP officer

9    prior to the issuance of the immigration arrest warrant. Moreover, as mentioned, the warrant does

10   not refer to the ATD violations. All this poses a risk of erroneous deprivation.

11   The Supreme Court has held that "the Constitution requires some kind of a hearing *before*

12   the State deprives a person of liberty or property." *See Zinermon v. Burch*, 494 U.S. 113, 127

13   (1990) (emphasis in original). However, the Court also recognized that there may be situations

14   that urgently require arrest, in which a prompt post-deprivation hearing is appropriate. *Id.* at 128

15   (noting there may be "special case[s]" where a pre-deprivation hearing is impracticable);

16   *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *9 (N.D. Cal. July 17,

17   2025) ("absent evidence of urgent concerns, a *pre*-deprivation hearing is required to satisfy due

18   process, particularly where an individual has been released on bond by an IJ"). The rapidly

19   developing caselaw on this subject gives limited guidance as to where this line should be drawn.

20   Those courts that have addressed detention-related habeas petitions brought by persons released

21   on ATD have required pre-deprivation process, but in somewhat different circumstances. In

22   *E.A.T.-B. v. Wamsley*, No. C25-1192-KKE, 2025 WL 2402130, at *4 (W.D. Wash. Aug. 19,

23   2025), the district court ordered the release of a petitioner arrested by ICE immediately after

24   appearing in immigration court. That court agreed with the petitioner that ICE's post hoc

25   explanation that ATD violations warranted his detention was pretextual, given that ICE first

26   became aware of petitioner's alleged ATD violations a few hours before his immigration hearing,

27   DHS did not raise those violations at the hearing or argue the petitioner should be detained for

28   any reason, and the petitioner was then provided multiple, inconsistent justifications for his arrest.

17

*Id.* In *Arzate v. Andrews*, No. 1:25-CV-00942-KES-SKO (HC), 2025 WL 2230521, at *7 (E.D. Cal. Aug. 4, 2025), converted to preliminary injunction sub nom, 2025 WL 2411010, at *1 (E.D. Cal. Aug. 20, 2025), the court ordered immediate release of in immigration detainee who had been in compliance with conditions of ATD, even though he had incurred a misdemeanor arrest while on parole, in part because no charges were ever filed.

Here, in contrast, Petitioner's ATD records indicate numerous violations. While Petitioner has offered explanations for them, the allegations are not obviously pretexual as in *E.A T.-B*. The fact that the violations were not referenced on the I-200 arrest warrant is troubling, but there is no obvious place to note such information on that form. Thus, there is a dispute of fact as to whether Petitioner repeatedly violated the terms of his parole. If Respondent's view of the facts is correct, it is at least arguable that providing Petitioner with notice and a pre-deprivation hearing would have been impracticable and/or would have motivated his flight. In similar circumstances, courts have refused to release the petitioners but have ordered timely bond hearings. *Carballo v. Andrews*, No. 1:25-CV-00978-KES-EPG (HC), 2025 WL 2381464, at *8 (E.D. Cal. Aug. 15, 2025), citing *Perera v. Jennings*, et. al, No. 21-CV-04136-BLF, 2021 WL 2400981, at *5 (N.D. Cal. June 11, 2021); *Pham v. Becerra*, No. 23-CV-01288-CRB, 2023 WL 2744397, at *6 (N.D. Cal. Mar. 31, 2023). "[A]llowing a neutral arbiter to review the facts would significantly reduce the risk of erroneous deprivation." *Guillermo M. R. v. Kaiser*, No. 25-CV-05436-RFL, 2025 WL 1983677, at *8 (N.D. Cal. July 17, 2025). Thus, the Court concludes that prompt, post-deprivation process is required here.

Finally, as other courts have done, the Court concludes that the government's interest in detaining Mr. Martinez Hernandez without proper process, is slight. In sum, the Court concludes that he has demonstrated a likelihood of success on the merits on his procedural due process claim.

2.    Irreparable Harm

"It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 247, 272 (1976) Where, as here, the "alleged deprivation of a

18

1    constitutional right is involved, most courts hold that no further showing of irreparable injury is

2    necessary." *Warsoldier v. Woodford*, 418 F.3d 989, 1001–02 (9th Cir. 2005) (quoting Wright,

3    Miller, & Kane, Federal Practice and Procedure, § 2948.1 (2d ed. 2004)).

4         The Ninth Circuit has recognized the "irreparable harms imposed on anyone subject to

5    immigration detention" including "subpar medical and psychiatric care in ICE detention

6    facilities" and "the economic burdens imposed on detainees and their families as a result of

7    detention." *Hernandez v. Sessions,* 872 F.3d 976, 995 (9th Cir. 2017); *Leiva-Perez v. Holder*, 640

8    F.3d 962, 969-970 (9th Cir. 2011) (the inability to pursue a petition for review may constitute

9    irreparable harm). In addition, Mr. Martinez Hernandez complains about the lack of sufficient

10   medical care has has received since his rearrest. He reports also that he has lost his housing

11   because the person from whom he was subletting a room, was no longer able to pay for the

12   housing without Petitioner's rent payment. Thus, he has shown he will suffer irreparable harm if

13   the injunction is not granted.

14        3.    Balance of the Harms/Public Interest

15        Because the interest of the government is the interest of the public, the final two factors

16   merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). The

17   *Pinchi* succinctly articulated the general public interest at stake:

18              "[T]he public has a strong interest in upholding procedural
               protections against unlawful detention, and the Ninth Circuit has
19             recognized that the costs to the public of immigration detention are
               staggering." *Jorge M. F.*, 2021 WL 783561, at *3 (cleaned up)
20             (quoting *Ortiz Vargas*, 2020 WL 5074312, at *4, and then quoting
               *Hernandez*, 872 F.3d at 996); *see also Preminger v. Principi*, 422
21             F.3d 815, 826 (9th Cir. 2005) ("Generally, public interest concerns
               are implicated when a constitutional right has been violated,
22             because all citizens have a stake in upholding the Constitution.").

23   *Pinchi*, at *3. In addition, without the requested injunctive relief, Mr. Martinez Hernandez faces

24   the danger of prolonged erroneous detention.

25        The potential cost to Respondent of providing a prompt bond hearing is *de minimis* in

26   comparison. *See Hernandez*, 872 F.3d at 996 ("Faced with such a conflict between financial

27   concerns and preventable human suffering, we have little difficulty concluding that the balance of

28   hardships tips decidedly in plaintiffs' favor."). Moreover, a party "cannot reasonably assert that it

1    is harmed in any legally cognizable sense by being enjoined from constitutional violations."

2    *Zepeda v. U.S. Immigr. & Nat. Serv.*, 753 F.2d 719, 727 (9th Cir. 1983). For these reasons, the

3    Court concludes that the balance of the equities and public interest weigh in favor of Mr.

4    Martinez Hernandez.

5         4.    Bond

6         "The court may issue a preliminary injunction or a temporary restraining order only if the

7    movant gives security in an amount that the court considers proper to pay the costs and damages

8    sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P.

9    65(c). The Court has "discretion as to the amount of security required, if any," and it "may

10   dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the

11   defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir.

12   2003) (citation modified). Because "the [Government] cannot reasonably assert that it is harmed

13   in any legally cognizable sense by being enjoined from constitutional violations," *Zepeda*, 753

14   F.2d at 727, the Court finds that no security is required here.

15        **C.    Burden of Proof**

16        In *Rodriguez Diaz v. Garland*, 53 F.4th 1189 (9th Cir. 2022), the Ninth Circuit considered

17   whether a noncitizen detained under § 1226(a) pending removal proceedings had a right to a

18   second bond hearing where the government would have the burden to establish by clear and

19   convincing evidence that his continued detention was justified. *Rodriguez Diaz* concluded that

20   due process did not require that procedure, reasoning in part that:

21              Nothing in this record suggests that placing the burden of proof on
              the government was constitutionally necessary to minimize the risk
22            of error, much less that such burden shifting would be
              constitutionally necessary in all, most, or many cases. There is no
23            reason to believe that, as a general proposition, the government will
              invariably have more evidence than the alien on most issues bearing
24            on alleged lack of future dangerousness or flight risk.

25   *Id*. at 1212.

26        However, as the *Pinchi* court explained, *Rodriguez Diaz* did not address the question

27   presented here:

28              The Ninth Circuit did not hold in *Rodriguez Diaz* that noncitizens

20

1                     facing removal under section 1226(a) have no due process right to a
                    pre-detention hearing. It held only that a noncitizen detained under
2                     section 1226(a) does not have a right to a second bond hearing
                    when the only changed material condition since their first bond
3                     hearing is the duration of their detention. Because the question
                    presented here was not presented in Rodriguez Diaz, the court had
4                     no opportunity to address it.

5 *Pinchi*, 2025 WL 2084921, at \*4. *Pinchi* went on to discuss why the calculus changes for an

6 individual who had been paroled from immigration custody after their initial detention:

7                     Even assuming arguendo that the post-detention bond hearing
                    provided under section 1226(a) provides constitutionally sufficient
8                     process for those noncitizens who have never previously been
                    detained and released by DHS, [Petitioner's] circumstance is
9                     different. Her release from ICE custody after her initial
                    apprehension reflected a determination by the government that she
10                     was neither a flight risk nor a danger to the community, and [she]
                    has a strong interest in remaining at liberty unless she no longer
11                     meets those criteria. The regulations authorizing ICE to release a
                    noncitizen from custody require that the noncitizen "demonstrate to
12                     the satisfaction of the officer that such release would not pose a
                    danger to property or persons" and that the noncitizen is "likely to
13                     appear for any future proceeding." 8 C.F.R. § 1236.1(c)(8).
                    "Release [therefore] reflects a determination by the government that
14                     the noncitizen is not a danger to the community or a flight risk."
                    *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017),
15                     aff'd sub nom. *Saravia for A.H. v. Sessions*, 905 F.3d 1137 (9th Cir.
                    2018). [Petitioner] was apprehended by ICE officers when she
16                     crossed the border into the United States [ ]. ICE then released her
                    on her own recognizance. As ICE was not authorized to release
17                     [her] if she was a danger to the community or a flight risk, the
                    Court must infer from [her] release that ICE determined she was
18                     neither. [her] release from ICE custody constituted an "implied
                    promise" that her liberty would not be revoked unless she "failed to
19                     live up to the conditions of her release." *Morrissey*, 408 U.S. at 482.
                    The regulatory framework makes clear that those conditions were
20                     that she remain neither a danger to the community nor a flight risk.
                    [She] justifiably relied on the government's implied promise in
21                     obtaining employment, taking on financial responsibility for her
                    family members, and developing community relationships. The
22                     more than two years that she has spent out of custody since ICE
                    initially released her have only heightened her liberty interest in
23                     remaining out of detention. Accordingly, [her] private interest in
                    retaining her liberty is significant.
24

25 *Pinchi*, 2025 WL 2084921, at \*4

26        This reasoning contributed to the conclusion in *Pinchi* that a pre-deprivation hearing was

27 required under *Mathews*. The court in *Pinchi* also placed the burden at any such hearing on the

28 government to demonstrate to a neutral decisionmaker by clear and convincing evidence that re-

21

1  detention is necessary to prevent danger to the community or flight. *Id*. at \*7. That burden shifting

2  is logical even for a post-deprivation hearing for the reasons articulated in *Pinchi* – namely that

3  the immigrant's initial release reflected a determination by the government that the noncitizen is

4  not a danger to the community or a flight risk. Since it is the government that initiated re-

5  detention, it follows that the government should be required to bear the burden of providing a

6  justification for the re-detention.

7  **CONCLUSION AND ORDER**

8       For the foregoing reasons, the Court **ORDERS:**

9       1.     Petitioner's Motion for Temporary Restraining Order (Doc. 5) is converted to a

10  Motion for Preliminary Injunction, and it is **GRANTED**.

11       2.     Mr. Martinez Hernandez **SHALL** be provided a bond hearing **within 10 days** of

12  service of this order.

13       3.     At any such hearing, the Government **SHALL** bear the burden of establishing, by

14  clear and convincing evidence, that Mr. Martinez Hernandez poses a danger to the community or

15  a risk of flight, and Mr. Martinez Hernandez **SHALL** be allowed to have counsel present.

16       4.     Within three days of the bond hearing, Respondent **SHALL** file a status report in

17  this case confirming that the hearing has been provided.

18       5.     Because counsel agree that no further briefing is needed on the merits of the

19  petition, the Court takes the merits of the petition under submission.

20

21  IT IS SO ORDERED.

22     Dated:   **August 28, 2025**

                                       UNITED STATES DISTRICT JUDGE

23

24

25

26

27

28